# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED
APR 24 2023
LAURA A. AUSTIN, CLERK
BY: *A. Meade*
DEPUTY CLERK

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 1:23mj53
White Apple iPhone with black case in the possession of )
ATF )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Western___ District of ___Virginia___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 & 841(b)(1)(A) | Knowingly and intentionally conspire to distribute and possess with the intent to distribute fentanyl, a Schedule II controlled substance. |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Temm, Senior Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/24/23

*Judge's signature*

City and state: Abingdon, VA        Pamela Meade Sargent, USMJ
                                    *Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

Your affiant, Ryan C. Temm, a Senior Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, assigned to the Bristol, Virginia Field Office, having been duly sworn, deposes and states as follows:

### INTRODUCTION

1. I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, and I am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18.

2. I am a Senior Special Agent (SSA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed for approximately fourteen and a half (14.5) years. I received my training with the Federal Law Enforcement Training Center (FLETC) and the ATF at the National Academy in Brunswick, Georgia. At the ATF National Academy, we trained in various investigative techniques, including the preparation of a proper criminal complaint and arrest warrant. Since becoming a Special Agent with ATF, I have participated in numerous search and arrest warrants. I have a Bachelor of Arts Degree in Criminal Justice from The George Washington University and a Master of Public Administration from the University of North Carolina at Charlotte. I also successfully completed a basic law enforcement academy with the Charlotte-Mecklenburg Police Department and served nearly eight years as a police officer.

3. During my tenure in law enforcement, I have become familiar with the manner and methods criminals use to manufacture, possess, and distribute firearms and narcotics.

Based on my training and experience, I have become familiar with methods used by drug traffickers to smuggle and safeguard narcotics, distribute narcotics, and collect and launder proceeds. The affiant is aware of the sophisticated tactics drug traffickers routinely use to attempt to thwart detection by law enforcement, which includes using numerous different cellular telephones, counter surveillance, elaborately planned distribution schemes, false or fictitious identities, and coded communications and conversations.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 & 841(b)(1)(A) (Conspiracy to distribute and possess with the intent to distribute fentanyl, a Schedule II controlled substance) have been committed by Marco Antonio OROZCO and others in or about and between 2020 and 2022. There is also probable cause to search a white Apple iPhone with black case and a black Apple iPhone with black case as described in the Attachment As for evidence of this crime, as described in the Attachment Bs.

## PROBABLE CAUSE

6. In 2022, detectives from the Newport Beach Police Department (NBPD) were investigating Marco Antonio OROZCO's distribution of fentanyl. NBPD Detective Travis Cooke obtained a search warrant for OROZCO, his vehicle, and his apartment located at 2855 Pinecreek Drive, #F403, Costa Mesa, California.

7. On December 8, 2022, NBPD detectives and officers executed the search warrants. When the officers arrived at OROZCO's residence, OROZCO provided Detective Cooke with the key to his apartment and stated no one should be inside his apartment. Detective Cooke asked OROZCO if there was anything inside his apartment that could cause harm to personnel on scene. OROZCO advised Detective Cooke there would be "blues" in the closet to the right when they entered the apartment. I know from my training and experience and participation in this investigation that "blues" is common street vernacular for blue circular pressed "M30" fentanyl pills.

8. During the search of OROZCO's apartment, officers found the following items:

    a. Three sandwich bags containing multiple circular orange pressed "AD 30" and "DP 30" pills, which the state lab confirmed to contain Adderall;

    b. Ten sandwich bags containing multiple circular orange pressed "AD 30" and "DP 30" pills, which the state lab confirmed to contain Adderall;

    c. A grocery bag containing six sandwich bags with multiple blue circular pressed "M 30" pills, which the state lab confirmed to contain fentanyl;

    d. A USPS box containing six sandwich bags with multiple white rectangular pressed pills stamped "G3722", which the state lab confirmed to contain Xanax;

    e. One sandwich bag with multiple green rectangular pressed pills stamped "S903", which the state lab confirmed to contain Xanax;

    f. One sandwich bag with multiple yellow rectangular pressed pills stamped "R039", which the state lab confirmed to contain Xanax;

    g. A black 9mm handgun with no serial markings, containing a 31-round capacity extended magazine loaded with nine (9mm) ammunition;

    h. A black Apple laptop;

    i. $2,312 in U.S. currency;

    j. A black backpack with cherry logos as a design, containing $4,020 in U.S. currency, an electric bill addressed to OROZCO, a digital scale, and a black pouch labeled "BONAFIDE California" containing ten sandwich bags with multiple blue circular pressed "M 30" pills, which the lab confirmed to contain fentanyl.

9. During the search of OROZCO's vehicle, a 2018 black Honda Civic, officers found a bag containing 50 brown glass jars labeled "Farmapram Alprazolam, 2.0mg, 90 tabletas", with a total of approximately 4,500 white oblong pills; a digital scale; and a white Apple iPhone containing OROZCO's California driver's license in a magnetic sleeve attached to the back. A black Apple iPhone was found on OROZCO's person.

10. In total, NBPD officers located approximately 4,500 Alprazolam pills, 3.57 pounds of "M30" fentanyl pills, 9.12 pounds of Adderall pills, and 4.56 pounds of Xanax pills in OROZCO's apartment and vehicle. Based on my training and experience, I know the quantity of pills located in OROZCO's apartment and vehicle are far greater than that kept for personal use.

11. OROZCO was placed under arrest at the time of the execution of the search warrants. Detective Cooke conducted a post-Miranda interview of OROZCO. OROZCO said he lived in the apartment by himself, and he was the only person named on the lease. OROZCO stated, "it's all mine," when asked about the items found during the searches. OROZCO told Detective Cooke his income was as a breeder of French Bulldogs. Detective Cooke asked OROZCO about the black backpack with the cherry designs on it; OROZCO said it was his backpack. OROZCO estimated a total of $6,000 to $7,000

cash was inside his apartment. He said the money had "just accumulated over time." OROZCO acknowledged all the cash inside the apartment was his. When asked if anyone else had access to his apartment, OROZCO said no one else had a key to the apartment.

12. During the interview, Detective Cooke asked OROZCO if he knew what all the pills found in the apartment were, by describing each type of pill officers had found. Detective Cooke also asked OROZCO where he got the pills and whether he bought them or manufactured them. OROZCO said he did not make anything, but "would rather not say" where he got the pills. Detective Cooke asked if he was getting all the pills from the same place or person, and OROZCO said, "just a bunch of different places."

13. OROZCO confirmed the orange circular pills were Adderall, the white bars stamped "G3722" were Xanax, the green bars stamped "S903" were pretty much the same thing and acknowledged they were Xanax, and the yellow bars stamped "R039" were Xanax. When asked about the blue "M30s," OROZCO said they "are just M30s." Detective Cooke then asked if they contained fentanyl and OROZCO said he was "not sure." He said he refers to them as "blues" or "M30s."

14. Detective Cooke asked OROZCO about the handgun with no markings, and he responded "it wasn't even mine," then said, "literally, it's just for protection." OROZCO said a friend had given it to him because someone was trying to rob him. Detective Cooke asked OROZCO if he was being truthful when he said everything in the apartment was his and OROZCO said, "I mean yeah, besides the strap," referring to the gun.

15. Detective Cooke asked OROZCO about his two cell phones. OROZCO said one was in his vehicle and one was on him. OROZCO said both the cell phones belonged to him. The white Apple iPhone was not locked and did not contain a passcode for access. The black Apple iPhone found in OROZCO's possession was locked and required a six-digit passcode.

16. Based on my training and experience and participation in this investigation, I know drug dealers often use multiple cell phones to communicate with potential buyers.

17. During a hand search of the white Apple iPhone conducted by NBPD Detective Cooke, the "Contacts" function was checked. The "My Card" listed the phone's contact number as "949-867-8096." In the text application, Detective Cooke located a conversation between OROZCO (949-867-8096) and a contact listed as "Jr. (Custi)" stemming from October 9, 2022, to December 2, 2022. The summary of the conversation is as follows:

    a. OROZCO: What's good

    b. Jr. (Custi): Yoo

    c. Jr. (Custi): Can I go get some blues

    d. Jr. (Custi): Yoo got Pharmas?

    e. OROZCO: Yeah

18. Based on my training and experience and participation in this investigation, I recognize the above texts to be consistent with that of an exchange of illicit drugs, particularly fentanyl pills and pharmaceutical pills such as Xanax.

19. Detective Cooke located another conversation between OROZCO and a contact with the number 714-710-0169 on August 28, 2022. The summary of the conversation is as follows:

    f. OROZCO: I got farmas

    g. 714-710-0169: Breh I've been trying to hit ur line

    h. 714-710-0169: I picked up already but what's your ticket

    i. 714-710-0169: Are you still shooting it for 11?

    j. OROZCO: I can do 1k flat on boats

    k. OROZCO: That's what I do on numbers

    l. OROZCO: I'll bless you let's run it up

    m. 714-710-0169: Fosho sounds Gucci boss

20. Based on my training and experience and participation in this investigation, I recognize the above texts to be consistent with that of an exchange of illicit drugs, particularly pharmaceutical pills, such as Xanax. Another term I recognize in the conversation is "1k flat on boats." The term "boat" is street vernacular for 1,000 pills. OROZCO is negotiating to sell a "boat" or 1,000 pills for "1k" or $1,000 in U.S. currency. I believe a search of OROZCO's cell phones will provide further evidence OROZCO was selling illegal narcotics including fentanyl and Xanax.

21. On December 27, 2022, a little over two weeks after the search warrants were executed, OROZCO pleaded guilty in California state court to possession/purchase for sale narcotics/controlled substances and possession of controlled substances for sale. He was sentenced to 28 days incarceration and two years' probation. He is currently on state supervision.

22. In January 2023, Jorge Efrain Perez, Jr. pleaded guilty pursuant to a plea agreement in the Western District of Virginia, to conspiring to distribute and possess with the intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A). Perez was interviewed by United States Postal Inspector Rob Wagner, Assistant United States Attorney (AUSA) Lena Busscher, AUSA Danielle Stone and your affiant after his guilty plea. Perez's attorney, Mike Bragg, was also present.

23. During the interview, Perez identified Marco OROZCO as a primary source of fentanyl for the conspiracy to which he pleaded guilty. Perez said he knew OROZCO, also known as "Philly", from high school. Perez said in mid-2020, he began mailing drug packages for OROZCO. Over time, Perez said he helped OROZCO package and ship pressed M30 pills, marijuana, wax, mushrooms, and other drugs. According to Perez, OROZCO addressed the drug parcels, which were packaged at OROZCO's apartment at 2528 Pine Creek Drive in Costa Mesa, California. Perez described the layout of OROZCO's apartment and said the fentanyl pills were kept in the dog room in a closet in a blue lunch bag. Perez said he stopped going to OROZCO's apartment because it became too "hot" with people showing up to buy and sell drugs. Even after Perez stopped going to OROZCO's apartment, he said he continued to ship drug packages for OROZCO up until his arrest on June 22, 2022. Perez would either pick up the drug packages outside OROZCO's apartment and take them to various area post offices, or OROZCO would pick Perez up and drive him to the post office to mail the packages. Perez said he shipped drug packages for OROZCO ranging from daily to once a week. This went on from mid-2020 to June 2022. OROZCO paid him anywhere from $20 to $500 per package, depending on what was in the package.

24. Perez said he knew Alex Ortiz was someone who gave OROZCO drug orders to fill, but that he did not know Alex Ortiz other than seeing him one time with OROZCO. Perez said he also received cash boxes in the mail at his home on 10 to 15 occasions. The cash boxes were payments for drugs OROZCO had shipped out. When Perez received cash boxes, he contacted OROZCO via Facetime to make arrange for OROZCO to get the cash.

25. Perez also said he drove to pick up fentanyl pills from OROZCO's source on three to five occasions. The source was called "Quil." Perez said "Quil" dropped off drugs at OROZCO's apartment, too. Perez did not know how many pills he picked up each time for OROZCO because they were in stapled bags. He carried money for the pills from OROZCO but did not know how much. Perez said the payments were usually multiple inches thick of $20 bills.

26. Perez said he communicated with OROZCO about the drug business primarily via Facetime. He said OROZCO also utilized Snapchat on his phones for drug activities, and that OROZCO's Snapchat account is/was "dailybag" or "dailybag420."

27. In January 2023, Alexander Ortiz pleaded guilty pursuant to a plea agreement in the Western District of Virginia, to conspiring to distribute and possess with the intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Ortiz was interviewed by United States Postal Inspector Rob Wagner, Assistant United States Attorney (AUSA) Lena Busscher, AUSA Danielle Stone and your affiant after his guilty plea. Ortiz's attorney, Dennis Jones, was also present.

28. During the interview, Ortiz identified Marco OROZCO, or "Philly," as his primary source for fentanyl for the conspiracy to which he pleaded guilty. Ortiz said he had been selling pressed fentanyl pills and other drugs through social media from mid-2020 to the time of his arrest on June 20, 2022. Ortiz said he met OROZCO through his friend "RJ" in late 2020 or early 2021. RJ also bought pressed fentanyl pills from OROZCO and told Ortiz that OROZCO undercut everyone else's prices on the drugs he sold. Ortiz said at first, OROZCO sold him pressed fentanyl pills for $1.50 per pill, but as Ortiz started buying bigger quantities of pills, the price dropped to $1.20 per pill and then $1.10 per pill. Ortiz said he bought 1,000 pills at a time from OROZCO, which progressed to 5,000 pills and eventually to 10,000 pills every month or so. He sold 1,000 pills to his customers for approximately $4,000. Ortiz said the common nicknames for pressed fentanyl pills are "blues," "pressies," "yerks," "berries," and "bs," among others. He also said the word "boat" is used to describe 1,000 pills. Ortiz recognized Jorge Perez's name as someone who he would have his clients send money to when he bought pills through OROZCO. Ortiz said he and OROZCO communicated about drugs via Telegram and Snapchat, which are cell phone applications.

29. Ortiz said OROZCO gets his fentanyl pills from Los Angeles, possibly from a Mexican source. OROZCO gets 40,000 to 50,000 pills every month to every other month. OROZCO has stopped by Ortiz's apartment after reupping his supply and had the pills hidden amongst his dog's things.

30. Ortiz said he sent money to OROZCO and his girlfriend, Miranda LNU (Anderson) for drugs via CashApp and Apple Pay.

31. On April 19, 2023, Jorge Perez was interviewed again by United States Postal Inspector Rob Wagner, Assistant United States Attorney (AUSA) Lena Busscher, AUSA Danielle Stone and your affiant. Perez's attorney, Mike Bragg, was also present. During the interview, when asked how OROZCO knew the addresses of where to send the drug packages, Perez said OROZCO got the addresses "from his phones." Perez said OROZCO always had two phones with him while packaging and shipping the drug parcels, and that he personally witnessed OROZCO utilizing both phones to discuss his drug business and to look up addresses to place on the outside of the drug parcels. This was during the timeframe of mid-2020 to June 23, 2022. Perez also reiterated that during the conspiracy, he communicated with OROZCO about drugs via Facetime and Snapchat, a mobile phone application.

32. According to Detective Cooke, the two subject cellphones were logged as evidence at the time of the California search warrants on OROZCO's residence, vehicle, and person. Additional state search warrants for the cellphones were secured in California immediately after the searches, but never executed because OROZCO's state case resolved quickly with a guilty plea as stated above. According to Detective Cooke, OROZCO has not asked for the cellphones to be returned to him.

33. As outlined above, the government's investigation of OROZCO continued following his arrest in California and new evidence discovered through the investigation made the search of these devices important to the investigation. For example, following OROZCO's arrest in California, Alex Ortiz and Jorge Perez both identified OROZCO as a major fentanyl source and indicated they discussed OROZCO's drug business via Facetime and other cellphone applications such as Snapchat and Telegram. Ortiz also

indicated he sent OROZCO money transfers via CashApp and Apple Pay. Because of these new developments, NBPD Detective Cooke sent the two subject iPhones to me and they are currently located at the ATF's Bristol Field Office in the Western District of Virginia.

34. Based on my training and experience, I know cellular phones can contain a substantial amount of information relevant to this investigation. Criminals often use cellular phones to communicate with accomplices and will sometimes store accomplices' contact information in address books, speed dial lists or in other areas of the phone. These communications can occur through typical telephone calls or through instant messaging or text messages.

35. To the extent criminals use services such as instant messaging or text messages, these messages can sometimes be found on the cellular phone itself. Criminals also use cellular phones to document criminal activities both by photographs, videos as well as digital memos. I know these images and memos are also stored on the phone itself. Also, information can be located on the SIM (Subscriber Identity Module) which is a smart card located in the phone which also contains network information. Removable memories are also sometimes located in a cellular handset that allow the user to store vast amounts of electronic data.

36. I know devices such as these phones can store a large number of phone numbers and call history and some mobile phones can also contain contact information and calendar information and can be linked, either by wire or wireless, with computers. Camera phones can contain images. This information can be valuable evidence in determining and/or identifying other participants in a criminal enterprise.

37. I know those involved in criminal enterprises sometimes use multiple phones to separate contacts with different participants or to attempt to avoid detection and monitoring by law enforcement. They also sometimes possess multiple phones to have a backup means of communication in case a phone is lost or seized by law enforcement.

38. Likewise, I know images from a phone camera can contain evidence of where a subject has been and with whom the subject has associated.

39. The phones are currently in the custody of the ATF at the Bristol, Virginia Field Office. I know the phones have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the phones first came into the possession of law enforcement.

40. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the phones consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

41. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

42. Based upon the above facts, I believe there is probable cause to believe that examination of the electronic data on the subject cellphones will provide evidence of

the crime of conspiracy to distribute fentanyl in or about and between 2020 and 2022, in violation of 21 U.S.C. § 846.

Respectfully submitted,

Ryan C. Temm
Senior Special Agent

Subscribed and sworn to before me
on 4/24/23            :

UNITED STATES MAGISTRATE JUDGE

Reviewed by Lena Busscher

**ATTACHMENT A**
**Western District of Virginia**
**ATF Investigation 768010-22-0011**

1. White Apple iPhone with black case in the possession of ATF.

## ATTACHMENT B

## DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

Any and all electronic data regarding violations of 21 U.S.C. § 846 contained in the memory or call history of the cellular phone, including any names, phone numbers, addresses, contact information, data, text messages, images, voice memos, photographs, videos, internet access, documents or other information contained in the cellular phones internal, external or removable memory of memories, which includes any smart cards, SIM cards or flash cards.